**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RANDY M. MULHOLLAND and** | : | |
| **CHRISTINE KURTZ,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE GOVERNMENT OF THE** | : | |
| **COUNTY OF BERKS,** | : | **No. 10-5616** |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                 **March 28, 2012**

Randy Mulholland and Christine Kurtz sued the Government of Berks County, Pennsylvania under 42 U.S.C. § 1983 for violations of their procedural and substantive due process rights. After Plaintiffs rested their case at trial, Defendant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The Court granted the motion. This Memorandum explains the reasons for that decision.

## I.      BACKGROUND

### A.      The July 1996 Incident

Randy Mulholland and Christine Kurtz live in Reading, Pennsylvania and consider themselves common-law husband and wife. (2/13/12 Trial Tr. at 99-100; 2/14/12 Trial Tr. at 70.) Together they are the parents of five adult children. (2/13/12 Trial Tr. at 104.)

Plaintiffs claim their due process rights were violated by the conduct of Berks County Children and Youth Services ("BCCYS"), an agency of Berks County, following an incident that took place in July 1996. (Def.'s Ex. 2 [Crime Investigation Report].) At the time, Mulholland and

Kurtz were separated and living in different homes. (2/13/12 Trial Tr. at 100.) One of their daughters, Linda Kurtz, then twelve years old, went to spend the weekend at Mulholland's apartment. (*Id.* at 45-46; Crime Investigation Report.) On the evening of July 6, 1996, Linda called her mother and said that her father was drunk and making her uncomfortable. (2/13/12 Trial Tr. at 48, 101.) Angry that Mulholland had broken his promise not to drink around the children, Kurtz called the police and went to pick up Linda. (*Id.* at 101-04.) The police arrived at Mulholland's apartment shortly after Kurtz. (*Id.* at 102.)

According to the police report from that night, Linda told an officer that Mulholland had masturbated in her presence and made sexual comments. (Crime Investigation Report.) At trial, however, Linda denied speaking with the police that night and testified that Mulholland never said or did anything of a sexual nature. (2/13/12 Trial Tr. at 50-51.) On July 8, 1996, Kurtz filed a petition for protection from abuse against Mulholland in the Berks County Court of Common Pleas, which accused Mulholland of seeking sex from Linda. (Def.'s Ex. 3 [Petition for Protection from Abuse].) Kurtz testified at trial that she lied about Mulholland's actions in the petition because she thought allegations of Mulholland's drinking would not be sufficient to obtain a protection from abuse order. (2/13/12 Trial Tr. at 103, 148.) A judge entered a protection from abuse order after Mulholland failed to appear at two hearings. (*Id.* at 103; Def.'s Ex. 5 [Final Protection Order].)

Mulholland was ultimately charged with indecent exposure, endangering the welfare of children, and harassment stemming from the July 1996 incident. (Def.'s Ex. 20 [Criminal File].) He pled guilty to the harassment charge and paid a $50 fine. (*Id.*) The remaining charges were dismissed on September 24, 1996. (*Id.*) Mulholland believed that Kurtz, not Linda, was the victim of the harassment charge, although the restitution order referenced only Linda. (2/14/12 Trial Tr. at 78-80;

2

Def.'s Ex. 10 [Restitution Order].)

On July 9, 1996, BCCYS caseworker Brandy Neider sent a CY-104 report of suspected child abuse to the Berks County District Attorney's Office. (Def.'s Ex. 2 [CY-104 Form]; 2/15/12 Trial Tr. at 58-65.) Additionally, on August 2, 1996, Neider completed a CY-48 child protective services investigation report identifying Mulholland as an "indicated" perpetrator of child abuse and sent it to ChildLine, a statewide child abuse registry maintained by the Pennsylvania Department of Public Welfare. (Def.'s Ex. 6 [CY-48 Form]; 2/15/12 Trial Tr. at 50-58.) The CY-48 form stated that the "[c]hild made consistent and believable statements to caseworker and collateral source" and that "[t]he perpetrator did not respond to request for interview." (CY-48 Form.) Neider testified that she had no independent recollection of the investigation—in her career she has performed over 750 investigations—but that the CY-104 and CY-48 forms were consistent with her usual investigation practices. (2/14/12 Trial Tr. at 208-09; 2/15/12 Trial Tr. at 56-57, 83-84.) However, all of the family members involved in the July 1996 incident testified that BCCYS never attempted to contact them as part of an investigation. (2/13/12 Trial Tr. at 52, 105-06; 2/14/12 Trial Tr. at 30, 77-78.)

Based on the CY-48 form sent by Neider, Mulholland was listed as an indicated perpetrator of child abuse on ChildLine. Mulholland testified that he never received notice of the ChildLine listing or the BCCYS investigation. (2/14/12 Trial Tr. at 81, 90-91.) He believed no record of the child abuse allegations remained once the charges of indecent exposure and endangering the welfare of children were dismissed. (*Id.* at 175.)

B.     **Subsequent Contacts with BCCYS**

BCCYS's involvement with the family continued after the 1996 incident. In 1998, Linda ran away with a friend from Texas, where Linda was living in her grandmother's home, and called

Mulholland from the bus terminal in Reading. (*Id.* at 82.) Mulholland picked up Linda and her friend, contacted BCCYS, and agreed to put the girls into a shelter until they could be returned to Texas. (*Id.* at 82-86, 178.) Linda spoke with a BCCYS caseworker who told her that she could not see her father because "he did something with [her]." (2/13/12 Trial Tr. at 54-55.) Linda denied the allegation but the caseworker "said she did not care and [did not] want to hear it." (*Id.* at 55.)

BCCYS attempted to renew its involvement with the family in 1999, after Plaintiffs' then-teenage son Irvin Martin-Green was adjudicated delinquent for raping his younger cousin. (2/13/12 Trial Tr. at 152-53; 2/14/12 Trial Tr. at 34.) Kurtz spoke with BCCYS about Irvin but refused services from the agency. (2/13/12 Trial Tr. at 153.) In response to a family service plan prepared by BCCYS, a lawyer representing Plaintiffs sent a letter instructing BCCYS "not to extend or offer any further services to this family." (*Id.* at 107-08; 2/14/12 Trial Tr. at 87; Pls.' Ex. 5 [8/13/99 Letter].) The letter also stated,

> [Y]our documentation refers to Mr. Mulholland as being a "perpetrator." Your Family Service Plan Review does not specify what you mean by a "perpetrator." It appears that you are insinuating that there has been sexual abuse committed by Mr. Mulholland. This allegation and reference is unfounded and you should immediately cease and desist from any such reference and delete any such reference from you[r] records.

(8/13/99 Letter.) Several days later, the lawyer sent a second letter to BCCYS warning,

> Both Mr. Mulholland and Ms. Kurtz are extremely dissatisfied that inferences and innuendo are being made as to Randy Mulholland being a sexual predator. There is no record that Mr. Mulholland has been convicted of any charge involving sexual abuse, nor has there been any court finding that he has been involved in any sexual abuse. Therefore, he has directed that you should be instructed to cease and desist from making any inference or innuendo to that effect. The records of your agency should be expunged to delete any such reference. If you do not confirm that this has been done, Mr. Mulholland is considering further legal steps which will compel you to take this action.

4

(Pls.' Ex. 6 [8/24/99 Letter].) BCCYS never responded to either letter, and Mulholland testified that he assumed no further action was needed. (2/13/12 Trial Tr. at 112; 2/14/12 Trial Tr. at 93, 95.) Neider testified that BCCYS was never advised that two of the charges against Mulholland had been dismissed and that the letters from Plaintiffs' attorney did not put BCCYS on notice of the dismissal. (2/14/12 Trial Tr. at 207-08, 216.)

In 2001, Mulholland and Kurtz purchased a house and moved in together. (*Id.* at 94.) Kurtz's sister-in-law also moved into the house with her children. (*Id.* at 95.) In approximately 2003, a BCCYS caseworker visited the house regarding an incident involving Mulholland and Kurtz's niece and spoke with the family members in the home, including Mulholland. (2/13/12 Trial Tr. at 113; 2/14/12 Trial Tr. at 95-96.) The caseworker did not raise any concerns at that time about Mulholland living in the same home as the children. (2/13/12 Trial Tr. at 114; 2/14/12 Trial Tr. at 96.) Nor were any concerns raised about Mulholland's presence when a BCCYS caseworker visited the house in 2005 to investigate another incident involving Mulholland and Kurtz's son Nathan Mulholland. (2/13/12 Trial Tr. at 114-17; 2/14/12 Trial Tr. at 97-102; Pls.' Ex. 8 [11/22/05 Notes from Home Visit].)

Mulholland called BCCYS in September 2006 after Kurtz took their granddaughter S.G. away from the home of her parents, Irvin and his girlfriend. (2/13/12 Trial Tr. at 118-19; 2/14/12 Trial Tr. at 103-04.) Kurtz was concerned about S.G.'s safety because Irvin and his girlfriend were drinking heavily, using drugs, and neglecting their daughter. (2/13/12 Trial Tr. at 117-20; Pls.' Ex. 10 [Compl. for Custody].) A BCCYS caseworker visited Mulholland and Kurtz's home and determined that S.G. should stay there over the weekend. (2/13/12 Trial Tr. at 119-20; Pls.' Ex. 9 [9/23/06 Notes from Home Visit].) Kurtz subsequently filed a complaint for custody of S.G. in the

5

Berks County Court of Common Pleas. (Compl. for Custody.) Mulholland and other family members, as well as several BCCYS employees, attended the custody hearing held on September 29, 2006. (2/13/12 Trial Tr. at 120-21; 2/14/12 Trial Tr. at 106-07.)

At the hearing, the BCCYS employees did not express any concerns about Kurtz taking custody of S.G., and the court granted temporary emergency custody to her. (2/13/12 Trial Tr. at 121; Pls.' Ex. 11 [Custody Order].) When Mulholland and Kurtz returned home with S.G. that evening, however, they encountered a group of BCCYS caseworkers and police officers. (2/13/12 Trial Tr. at 123.) BCCYS had obtained an emergency court order to remove the children from the home because Mulholland was an indicated perpetrator of child abuse. (*Id.* at 123-25; Def.'s Ex. 32 [9/29/06 Order].) Until that time, Mulholland and Kurtz had no knowledge of the ChildLine listing. (2/13/13 Trial Tr. at 163-64; 2/14/12 Trial Tr. at 182-83.) Plaintiffs' children were returned to Kurtz approximately six weeks later. (Def.'s Ex. 38 [11/8/06 Order].) To regain custody, Kurtz had to move into a separate residence while Mulholland attempted to challenge the ChildLine listing. (2/13/12 Trial Tr. at 125-27; 2/14/12 Trial Tr. at 112.)

The criminal charges of indecent exposure and endangering the welfare of children, which had been dismissed in 1996 but remained on Mulholland's criminal record, were expunged on May 4, 2007. (Pls.' Ex. 22 [Am. Expungement Order].) By the time Mulholland attempted to appeal his ChildLine listing in late 2007, BCCYS had destroyed its records of the 1996 investigation pursuant to state law.[1] (2/15/12 Trial Tr. at 57-58.) On October 8, 2008, following a hearing on the timeliness

---

[1] Pennsylvania law requires that county agencies such as BCCYS destroy all records about a child when he or she reaches the age of twenty-three. *See* 55 Pa. Code § 3490.39. Mulholland did not appeal his ChildLine listing until shortly after Linda had turned twenty-three. (2/14/12 Trial Tr. at 179; 2/15/12 Trial Tr. at 57.)

of Mulholland's appeal of the ChildLine listing, the Department of Public Welfare's Bureau of Hearings and Appeals found that the Department of Public Welfare had not sent proper notice of the listing and ordered a hearing on the merits. (Pls.' Ex. 33 [Interlocutory Order].) During the appeal, BCCYS argued that Mulholland's status should be changed from indicated perpetrator to founded perpetrator because he had pled guilty to the harassment charge arising from the July 1996 incident. (2/14/12 Trial Tr. at 115, 217.) At trial, Neider testified that this was a legal decision made by the county solicitor representing BCCYS in the appeal. (*Id.* at 217, 220-21.) By order dated March 2, 2009, the Bureau of Hearings and Appeals adopted the recommendation of an administrative law judge who found that no substantial evidence existed to maintain Mulholland's ChildLine listing. (Pls.' Ex. 35 [3/2/09 Order].) The decision was affirmed upon reconsideration by the Department of Public Welfare and on appeal to the Commonwealth Court of Pennsylvania, and the ChildLine listing was expunged as of July 23, 2010. (Pls.' Ex. 37 [6/30/09 Order]; Pls.' Ex. 45 [7/23/10 Mem. Op. and Order].)[2] BCCYS argues that its ability to demonstrate substantial evidence during the appeals process was hampered because Mulholland did not appeal until after the agency's records had been destroyed. (2/13/12 Trial Tr. at 23.)

Plaintiffs filed this action on October 25, 2010, naming Berks County, BCCYS, and BCCYS Executive Director George Kovarie as Defendants. By Order dated December 5, 2011, the Court granted Defendants' motion for summary judgment as to the claims against BCCYS and Kovarie, who was sued in his official capacity. Plaintiffs' remaining claims against Berks County proceeded

---

[2] Pursuant to the Court's rulings on the parties' motions in limine, the relevant contents of Plaintiffs' Exhibits 22, 33, 35, 37, and 45 were to be summarized in binding jury instructions concerning the outcome of the underlying administrative proceedings, but the exhibits themselves were excluded by the Court to avoid confusing the jury. (2/13/12 Final Pretrial Conference Tr. at 20.)

to trial.

###### C.      BCCYS's Policies and Customs

At trial, Plaintiffs called two witnesses, Kovarie and Neider, to testify about the policies and customs of BCCYS. Both Kovarie and Neider said that the mission of BCCYS is to protect children and preserve family integrity as provided by law. (2/14/12 Trial Tr. at 53, 187.) BCCYS has three departments: intake services, in-home services, and placement services. (*Id.* at 50.) For the past four years, Neider has served as director of the intake services department, which handles screening and investigation of all child abuse allegations. (*Id.* at 51; 2/15/12 Trial Tr. at 21.) At the time of the July 1996 incident, Neider was a caseworker in the sexual abuse unit of the intake services department. (2/14/12 Trial Tr. at 186; 2/15/12 Trial Tr. at 49.) Each caseworker reports to a supervisor, who in turn reports to a departmental director. (2/14/12 Trial Tr. at 64.) Newly hired BCCYS caseworkers go through 120 hours of training on all of the agency's functions before they are certified for direct service with families. (2/15/12 Trial Tr. at 26.) They also receive a minimum of twenty hours of training each year. (*Id.* at 27.) Neider, as the director of intake services, develops and applies policy and procedures in that area. (2/14/12 Trial Tr. at 52-53; 186.)

Neider testified that BCCYS has a policy of following the child abuse investigation and reporting requirements of Pennsylvania's Child Protective Services Law ("CPSL") and regulations. (2/14/12 Trial Tr. at 187-89, 213, 218-19; 2/15/12 Trial Tr. at 26.) Under the CPSL, a county agency generally has thirty days, or a maximum of sixty days, to complete a child abuse investigation. 23 Pa. Cons. Stat. § 6368(c). In conducting an investigation, the agency must, if possible, interview the individuals who may have information about the suspected child abuse, including the child, the child's parents, the alleged perpetrator, the reporter, and eyewitnesses. 55 Pa. Code § 3490.55(d).

8

While a county agency "may rely on a factual investigation of substantially the same allegations by a law enforcement agency to support the agency's finding," this does not limit the agency's duty to conduct an independent investigation. 23 Pa. Cons. Stat. § 6362(d); *see also* 55 Pa. Code § 3490.54. After completing its investigation, the agency must submit a CY-48 form to ChildLine designating the report of child abuse as "unfounded," "indicated," or "founded." 23 Pa. Cons. Stat. § 6368(c); 55 Pa. Code § 3490.67. A report is indicated if "substantial evidence of the alleged abuse exists" based on available medical evidence, the child protective service investigation, or an admission by the perpetrator. 23 Pa. Cons. Stat. § 6303. Substantial evidence is "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." *Id.* A report is founded "if there has been any judicial adjudication based on a finding that a child who is a subject of the report has been abused, including the entry of a plea of guilty." *Id.* A report is unfounded if it is not indicated or founded. *Id.* Neider testified that ChildLine does not always adhere to the status determination made by BCCYS in the CY-48 form; in some instances, ChildLine has changed a status determination from indicated to unfounded. (2/14/12 Trial Tr. at 195-96.)

If a status determination cannot be made within sixty days and a criminal proceeding is pending, the county agency may send a CY-48 form to ChildLine with a status determination of "pending criminal court action." 55 Pa. Code § 3490.67. According to a policy clarification issued by the Department of Public Welfare, this status determination is appropriate "when additional information is needed in order to make a case status determination, but that information is not available to the investigating agency because of a criminal investigation or prosecution." (Pls.' Ex. 69 [Policy Clarification].) Neider testified that BCCYS caseworkers, in consultation with their

supervisors, decide whether this status determination is appropriate on a case-by-case basis. (2/14/12 Trial Tr. at 198.) In Neider's view, based on her reading of the CY-48 form submitted after the July 1996 incident, BCCYS "didn't need any more information in the Linda Kurtz case to make a status determination of indicated." (*Id.* at 223-24.)

Under the CPSL, the Department of Public Welfare must provide notice to individuals of their listing as indicated or founded perpetrators of child abuse on ChildLine and their right to appeal. 55 Pa. Code §§ 3490.40, 3490.40a. In addition, BCCYS has an internal policy of sending a letter to alleged perpetrators at the conclusion of an investigation, at the same time it submits the CY-48 form to ChildLine, to provide notice of the agency's status determination. (2/15/12 Trial Tr. at 32, 40-41.) BCCYS caseworkers receive training in sending out such notices. (*Id.* at 81.) Neider testified that she could not recall any other situation in which an individual had complained about not receiving a notice from BCCYS. (*Id.* at 58.)

The CPSL also mandates that a county agency submit a supplemental CY-49 form to ChildLine "when additional case information is obtained, including dates of birth, identity of the subjects, additional information about the nature of the abuse, or the case is presented before a court and there is a change in the status of the report." 55 Pa. Code § 3490.67. The CPSL provides that law enforcement agencies "shall, as soon as possible and without jeopardizing the criminal investigation or prosecution, advise the county agency as to whether a criminal investigation has been undertaken and the results of the investigation and of any criminal prosecution in cases of suspected child abuse." *Id.* § 3490.109. Neider testified that BCCYS depends on law enforcement agencies to provide updates on the outcome of investigations and prosecutions, but the law enforcement agencies often neglect to do so. (2/14/12 Trial Tr. at 194; 2/15/12 Trial Tr. at 67-68.) A Department of Public

Welfare policy clarification states that "the lack of a criminal conviction does not mean that a report of child abuse must be unfounded" because "the criminal proceeding is not making a determination as to whether or not a child has been abused, but instead is determining whether the actions of an individual constitute a criminal offense." (Policy Clarification.)

Neider testified that BCCYS has a policy of submitting CY-49 forms to ChildLine to report birth dates, Social Security numbers, or additional evidence of abuse, but not to report exculpatory information. (2/14/12 Trial Tr. at 200, 220, 225.) Accordingly, BCCYS does not submit a CY-49 form when an alleged victim of abuse later recants or when an alleged perpetrator denies culpability. (*Id.* at 200, 211.) Instead, BCCYS relies on the Department of Public Welfare's appeals process to determine whether a report status should be changed to unfounded. (*Id.* at 200, 212-13.)

## II.        STANDARD OF REVIEW

Judgment as a matter of law is appropriate when the nonmoving party "has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis" to find in favor of the nonmoving party. Fed. R. Civ. P. 50(a)(1); *see also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149-51 (2000); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995). Motions under Rule 50(a) should be granted only if "there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (internal quotation marks omitted).

A district court presented with a Rule 50 motion must view the record as a whole, drawing "all reasonable inferences in favor of the nonmoving party," and may not weigh the evidence or

determine the credibility of the witnesses. *Reeves*, 530 U.S. at 150; *see also McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir. 1995). "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (internal quotation marks omitted).

## III.   DISCUSSION

Plaintiffs claim that BCCYS violated their procedural and substantive due process rights by: (1) failing to conduct an adequate investigation before reporting Mulholland to ChildLine as an indicated perpetrator of child abuse, (2) failing to provide notice to Mulholland at the conclusion of its investigation, (3) failing to update ChildLine upon receiving exculpatory information, (4) removing Plaintiffs' children and grandchildren from their home, and (5) attempting to change Mulholland's status from indicated to founded during the appeals process.

Plaintiffs' claims arise under Section 1983, which provides a cause of action against a state actor for violating a federal right. *See* 42 U.S.C. § 1983; *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268 & n. 3 (3d Cir. 2000). Berks County is the sole Defendant in this case; Plaintiffs did not sue any BCCYS employees in their individual capacities. Municipal liability under Section 1983 is limited to those circumstances in which the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). As explained below, the Court granted Defendant's Rule 50 motion because Plaintiffs failed to establish that any constitutional deprivation they suffered was caused by an official policy or custom of BCCYS.

12

### A.    Constitutional Standards

Because Plaintiffs have not met the requirements for a Section 1983 claim, the Court will not reach the ultimate question of whether Plaintiffs' procedural and substantive due process rights were violated. Nonetheless, the applicable constitutional standards are relevant to the Court's analysis. Parents have a fundamental liberty interest in the custody, care, and management of their children.[3] *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997). However, "this interest is not absolute" and must be balanced against the government's compelling interest in protecting children. *Id.* "The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process." *Id.*

### 1.    Procedural Due Process

To establish a procedural due process violation, a plaintiff must show that: (1) there has been a deprivation of liberty or property, and (2) the procedures used by the government in effecting this deprivation were constitutionally inadequate. *See Studli v. Children & Youth & Families Cent. Reg'l Office*, 346 F. App'x 804, 813 (3d Cir. 2009). To determine what process is due in a particular situation, courts consider three factors: (1) the private interest at stake, (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value of different procedures, and (3) the government's interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and

---

[3] Plaintiffs also claim constitutional violations in connection with their grandchildren. The Third Circuit has not addressed the extent to which grandparents may have an analogous liberty interest with respect to their grandchildren. *See Rees v. Office of Children & Youth*, 744 F. Supp. 2d 434, 445 (W.D. Pa. 2010).

in a meaningful manner." *Id.* at 333 (internal quotation marks omitted).

The Court finds that listing Mulholland as an indicated perpetrator of child abuse on the ChildLine registry deprived both Mulholland and Kurtz of their liberty interest in familial integrity. This interest must be weighed against the government's compelling interest in protecting children from abuse. *See Miller v. City of Phila.*, 174 F.3d 368, 373 (3d Cir. 1999). Plaintiffs do not challenge the validity of the CPSL's procedures for investigation of child abuse allegations and appeal of a ChildLine listing. Rather, Plaintiffs claim that BCCYS violated the CPSL by conducting an inadequate investigation into the allegations against Mulholland and by failing to update ChildLine with potentially exculpatory information. Statutory violations do not necessarily amount to constitutional violations. *See Brown v. Daniels*, 290 F. App'x 467, 471 (3d Cir. 2008) ("It is well settled that state law does not define the parameters of due process for the purposes of the Fourteenth Amendment."). However, "the statutory schemes adopted by the Pennsylvania legislature in the familial integrity arena are highly relevant" to the determination of what process is due. *Id.* at 472 (internal quotation marks and emphasis omitted).

The CPSL places responsibility for investigating allegations of child abuse on the county agency. 23 Pa. Cons. Stat. § 6362. "[T]he Due Process Clause requires a State to consider both inculpatory and exculpatory evidence *before* classifying an accused individual as an 'indicated' child abuser and listing his or her name in a 'central register' . . . ." *See Burns v. Alexander*, 776 F. Supp. 2d 57, 89 (W.D. Pa. 2011). The CPSL's substantial evidence standard—which requires a county agency to consider not only evidence that supports a finding of child abuse, but also "inconsistent evidence," in concluding that a report of suspected abuse is indicated—comports with this requirement. *Id.* at 87-90.

14

The Department of Public Welfare maintains ChildLine and is the only entity capable of amending or expunging a report on ChildLine. 23 Pa. Cons. Stat. §§ 6331, 6341. Once an individual is notified of an indicated report on ChildLine, he or she has forty-five days to request that the Secretary of Public Welfare amend or expunge the report. *Id.* § 6341(a)(2); 55 Pa. Code § 3490.105a. If the Secretary denies the request, the individual has a right to a hearing before the Department of Public Welfare's Bureau of Hearings and Appeals. 23 Pa. Cons. Stat. § 6341(c); 55 Pa. Code § 3490.106a. The administrative appeal proceedings are automatically stayed until the conclusion of any criminal proceedings concerning the same factual circumstances. 23 Pa. Cons. Stat. § 6341(d). The decision of the Bureau of Hearings and Appeals may be appealed to a state court. 2 Pa. Cons. Stat. § 702; 55 Pa. Code § 3490.106a(e).

The CPSL allocates the responsibility for providing notice of a ChildLine listing to the Department of Public Welfare, not the county agency. 55 Pa. Code §§ 3490.40, 3490.40a. Here, the Bureau of Hearings and Appeals found that Mulholland did not receive proper notice from the Department of Public Welfare, which is not a party in this case. (Interlocutory Order.) BCCYS cannot be held liable for the Department of Public Welfare's failure to send proper notice. Furthermore, the Court finds that the additional notice sent by BCCYS at the conclusion of an investigation, before an alleged perpetrator has been listed on ChildLine, is not constitutionally required because BCCYS does not maintain ChildLine or control whether ChildLine records are added, amended, or expunged.

The parties disagree about the meaning of 55 Pa. Code § 3490.67(d), which directs a county agency to submit a CY-49 form to ChildLine "when additional case information is obtained" concerning a founded or indicated report, including "additional information about the nature of the

abuse." Plaintiffs contend that this provision requires the agency to update ChildLine whenever it obtains potentially exculpatory information, while Defendant interprets the provision to require updates only for inculpatory information, since individuals listed on ChildLine can present exculpatory information through the appeals process. Whichever reading of the regulation is correct, Plaintiffs have not offered any support for their view that the Due Process Clause requires a county agency to report exculpatory information after it has completed its investigation and submitted a report to ChildLine. Given that the CPSL provides for notice and a meaningful opportunity to be heard through the appeals process, the Court finds no basis for imposing on county agencies an additional constitutional burden to update upon receiving exculpatory information. *See Miller*, 174 F.3d at 374.

### 2.   Substantive Due Process

To establish a substantive due process violation, a plaintiff must show that executive action was "so ill-conceived or malicious that it shocks the conscience." *Id.* at 375 (internal quotation marks omitted). "[A] child services bureau may be justified in removing either a child or parent from the home, even where later investigation proves no abuse occurred." *Croft*, 103 F.3d at 1126. However, interference with parental rights without "an objectively reasonable suspicion of abuse" based on the information available at the time is an arbitrary abuse of power that shocks the conscience. *Id.*; *see also Miller*, 174 F.3d at 376.

To the extent that Plaintiffs claim BCCYS violated their substantive due process rights by failing to update ChildLine with exculpatory information, the Court finds that this conduct was not "so clearly arbitrary" as to shock the conscience. *Miller*, 174 F.3d at 376. Plaintiffs did not establish that BCCYS was actually aware that two of the charges against Mulholland had been dismissed or

that Linda was not the victim of the harassment charge to which Mulholland pled guilty. Moreover, Mulholland's denial of culpability and Linda's recantation approximately two years after the July 1996 incident were not sufficient to undermine an objectively reasonable suspicion of abuse. *See United States v. Provost*, 969 F.2d 617, 621 (8th Cir. 1992) (noting, in context of motion for new criminal trial, that "the skepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon"). Notably, prior to her recantation, Linda told a psychologist in 1997 "that her father 'wanted me to do stuff with him' and attempted to engage her sexually while intoxicated." (2/15/12 Trial Tr. at 70-72; Def.'s Ex. 17 [Psychological Evaluation].) The Court will not address the constitutionality of BCCYS's other conduct because, as discussed below, Plaintiffs have not established the necessary link to an official policy or custom.

      **B.**    ***Monell* Claim**

      Berks County can be held responsible as a municipality only if Plaintiffs' alleged constitutional harms were caused by an official policy or custom of BCCYS. *See Jackson v. Cnty. of Wayne*, 217 F. App'x 103, 104 n.1, 106 (3d Cir. 2007). Official policy includes the acts of policymaking officials and "practices so persistent and widespread as to practically have the force of law." *Blakey v. City of Pittsburgh Police Dep't*, 449 F. App'x 135, 136 (3d Cir. 2011) (quoting *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011)). Failure to train employees will give rise to liability only if BCCYS was deliberately indifferent to the rights of individuals with whom the untrained employees came into contact. *See Connick*, 131 S. Ct. at 1359. Plaintiffs have not shown that any of the conduct alleged to violate their due process rights was the result of an official policy or custom.

17

### 1.    Inadequate Investigation

Plaintiffs claim that BCCYS failed to conduct an adequate investigation before reporting Mulholland to ChildLine as an indicated perpetrator of child abuse. There is no evidence that BCCYS has a policy or custom of conducting inadequate investigations into allegations of child abuse. To the contrary, Neider testified that BCCYS has a policy of complying with the procedures set forth by the CPSL. At the time of the July 1996 incident, Neider was a caseworker for BCCYS and did not hold a policymaking position. Even if Neider conducted an inadequate investigation and lacked substantial evidence to conclude that Mulholland was an indicated perpetrator of child abuse, Berks County cannot be held liable for a single caseworker's deviation from the requirements of the CPSL. Nor have Plaintiffs shown that Neider's allegedly unconstitutional conduct was the consequence of any deficiency in the training given to caseworkers.

Plaintiffs also suggest that Neider should have submitted a CY-48 form to ChildLine with a status determination of pending criminal court action instead of indicated. Neider testified that BCCYS caseworkers, in conjunction with their supervisors, make such status determinations on a case-by-case basis. Whether or not Neider chose the correct status determination in this particular case, there is no evidence that her decision was the result of a policy or custom of BCCYS.

### 2.    Failure to Provide Notice at Conclusion of Investigation

Plaintiffs assert that BCCYS did not provide notice to Mulholland at the conclusion of its child abuse investigation, in contravention of the agency's internal policy of providing such notice. As noted above, the statutory responsibility for providing notice to individuals listed on ChildLine rests with the Department of Public Welfare, not the county agency. BCCYS's notice policy thus goes beyond what the CPSL requires. There is no evidence that BCCYS has a widespread practice

of failing to provide notice in accordance with its internal policy. Indeed, Neider testified that she could not recall another situation in which an individual claimed not to have received notice from BCCYS.

### 3.    Failure to Update ChildLine with Exculpatory Information

Plaintiffs contend that BCCYS violated their due process rights by failing to update ChildLine when it became aware of information that cast doubt on the child abuse allegations against Mulholland. The Court has rejected Plaintiffs' argument that a county agency's failure to update ChildLine with exculpatory information constitutes a due process violation; thus, it is irrelevant that BCCYS has a policy of not providing such updates. *See Bright v. Westmoreland Cnty.*, 380 F.3d 729, 736 n.2 (3d Cir. 2004) (noting that "if there is no constitutional violation in the first instance, there can be no § 1983 liability" on the part of a municipality).

### 4.    Removal of Plaintiffs' Children and Grandchildren

Plaintiffs assert that the removal of their children and grandchildren from their home on September 29, 2006 violated their due process rights. A county agency does not have the authority to remove children from a home without a court order. (2/14/12 Trial Tr. at 54.) Kovarie testified that petitions for court orders are generally reviewed by at least three BCCYS supervisors and "available administrators." (*Id.* at 55, 63.) "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *McGreevy v. Stroup*, 413 F.3d 359, 368 (3d Cir. 2005) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)); *see, e.g.*, *Dennis v. DeJong*, Civ. A. No. 10-6789, 2011 WL 4732810, at *28-29, 33 (E.D. Pa. Sept. 30, 2011) (denying motion to dismiss *Monell* claim because plaintiffs alleged that policymaking administrators of children and youth services agency approved misrepresentations in custody petition

and late filing of dependency petition). Regardless, Plaintiffs offered no proof at trial that an individual with policymaking authority actually reviewed the petition that led to the September 29, 2006 court order. Therefore, Plaintiffs have not established that BCCYS's role in the removal of their children and grandchildren from their home was pursuant to an official policy or custom.

### 5.   Attempt to Change Status from Indicated to Founded

Lastly, Plaintiffs seek to hold BCCYS liable for arguing during the appeals process that Mulholland's status should be changed from indicated to founded because he had pled guilty to the harassment charge arising from the July 1996 incident. Neider testified that the attempt to change Mulholland's status was a legal decision made by the solicitor who represented Berks County in the appeal, and the solicitor did not seek Neider's advice as to whether this course of action was proper. (2/14/12 Trial Tr. at 217.) BCCYS never submitted a CY-49 form to have Mulholland's status changed. (*Id.* at 217-18.) There is no evidence that the solicitor's legal strategy represented an official policy or custom of BCCYS.[4]

## IV.   CONCLUSION

As Plaintiffs have not established that the alleged constitutional violations of BCCYS resulted from an official policy or custom, Defendant's Rule 50 motion is granted. An Order consistent with this Memorandum will be docketed separately.

---

[4] Defendant has not raised, and the Court need not determine, whether BCCYS would be entitled to absolute immunity under *Ernst v. Child and Youth Services of Chester County*, 108 F.3d 486 (3d Cir. 1997), which held that caseworkers "are entitled to absolute immunity for their actions in petitioning and in formulating and making recommendations to the state court" in dependency proceedings. *Id.* at 493.